MADDOX, Justice
(dissenting).
I would affirm the summary judgment.
The depositive issue, in my opinion, is whether the Musselmans, by renewing the note on April 1, 1983, effectively waived all claims and assertions against the bank that they otherwise might have been entitled to pursue. Stated differently, having renewed the note, had they waived their right to sue, as a matter of law?
Musselman contends, and the majority agrees, that the record is replete with evidence of insider trading and preferential treatment by The Bank of Huntsville in favor of one of its directors, D.L. Putman, and that only through discovery was he able to uncover numerous acts of deception on the part of The Bank of Huntsville. Specifically, Musselman argues that the bank had covered up the fact that it had sold the accounts receivable for $158,000, the receipt of which should have extinguished the debt evidenced by the $134,-174.63 note that was secured by Mussel-man’s house.
Essentially, Musselman maintains that there were four notes outstanding, three of which were personally guaranteed by D.L. Putman, and that the other note was personally guaranteed by him. Musselman readily admits that he renewed the note, but claims he did so under the threat of losing his house and without knowledge that the accounts receivable had been sold.
Musselman insists that the bank falsely induced him to agree to a “voluntary foreclosure” whereby he released his accounts receivable and inventory to the bank. He argues that the bank sold the inventory for approximately $243,000. Musselman claims that the sale of the inventory completely paid off the three notes on which Putman was the guarantor, but that none of the $243,000 from the sale of the inventory was applied to his note. Musselman points out that he later discovered that the accounts receivable had also been sold for approximately $158,000, and yet nothing was ever applied to his personal note. Musselman maintains that the money received from the sale of the accounts receivable constitutes an effective accord and satisfaction of his $134,174.63 note. In essence, Musselman argues that while he twice renewed the note on which his house was pledged, he did so under the mistaken belief that the accounts receivable had not been sold and that, because he was not privy to all the essential facts when he renewed the note, he should not be precluded from asserting the tort claims against the bank. The majority agrees with him, and in doing so, upsets the law of waiver, in my judgment.
It is generally accepted that the renewal of a note, with knowledge of facts that otherwise might be used as a defense to obligations under that note, effectively waives those defenses. See generally, 11 Am.Jur.2d Bills and Notes § 391 (1963). In 10 C.J.S. Bills and Notes § 278, p. 766-69 (1938), it is stated:
“As between the original parties to a note and transferees who are not holders in due course, a renewal note is open to all the defenses good against the original note, in the absence of a new consideration, waiver, or estoppel. For example, under such circumstances the renewal note is open to such defenses as mutual mistake, at least where it was not discovered until after the execution of the renewal note, want or failure of consideration, fraud, usury, forgery, gambling debts, or other illegality, where such defense is available against the original note. This rule does not apply, however, where a note is taken in payment and not in renewal.
*978 “Where the defense is such that it can be and is cured by the renewal, it cannot be urged. Thus one who gives a note in renewal of another note, with knowledge at the time of a partial failure of the consideration for the original note or of false representations by the payee or of fraud in the execution of the original note, etc., waives such defense and is estopped to set it up to defeat or to reduce a recovery on the renewal note, even though it was in the hands of a holder with knowledge of such fraud at the time of the renewal; and this rule also applies where the original instrument was a forgery and was claimed to be such by the maker of the renewal instrument. On the other hand the giving of a renewal note can amount to a waiver of such defenses where it is given with full knowledge of all material facts, and with intention clearly manifest to abide by the contract, and, of course, the mere giving of a renewal note does not waive such defenses where the right to assert them against the renewal note is expressly reserved, or where the renewal note itself is procured by fraud, as where the renewal was executed on the false representations of the holder of the original note that he was a holder in due course. Although it has been held that a renewal did not constitute a waiver of such defenses, even though the maker by due diligence could have discovered the facts, it is generally held sufficient to constitute a waiver if he had knowledge of facts sufficient to put him on inquiry, or if, by the exercise of ordinary diligence, he could have discovered the facts.” (Emphasis supplied.)
See also, Madison Nat’l Bank v. Lipin, 57 Mich.App. 706, 724, 226 N.W.2d 834, 843 (1975), wherein it was stated, “ ‘The execution of a renewal note constitutes a waiver of a previous defense only where the defendant had knowledge of the defense at the time of the renewal.’ ”
In Holczstein v. Bessemer Trust & Savings Bank, 223 Ala. 271, 136 So. 409 (1931), this Court held that the bank was entitled to the affirmative charge and upheld the defendant’s liability on a promissory note held by the bank, in a case in which the defendant debtor claimed that his signature on the original note was secured by fraud and misrepresentation and that he was therefore not liable for the debt. The facts of that case were that, as part of the purchase of a business, McElhenny’s co-defendant, Holczstein, had taken over the seller’s debts to the bank by making a note that McElhenny later endorsed. McElhen-ny claimed that, prior to his endorsement, the bank’s president had misrepresented to him the condition of the business. McEl-henny subsequently endorsed several renewal notes. He further claimed that he had signed the last of these renewal notes under threat of suit by the bank president, who had fraudulently represented “that [McElhenny’s] signature was nothing more than an endorsement.” This Court held that “the subsequent renewal of the note after knowledge of said fraud was a waiver of the defense.” 223 Ala. at 278, 136 So. at 415,
In the instant case, it is apparent that the Musselmans had knowledge of potential claims against the bank at the time they executed the renewal note. Musselman stated at his deposition that when they executed the renewal note in April 1983, they “pretty well knew” that a law suit against the bank was imminent:
“Q. When did you file suit?
“A. I don’t remember the date. In ’83.
“Q. What were you told when you renewed this $134,000 obligation in April, anything?
“A. April of ’83?
“Q. Yes.
“A. Well, I knew then that we had problems. I mean, it was very obvious, as I have already testified, that nothing was going to be done by this bank, and that’s the reason we are in the lawsuit today.
“Q. You knew that at the time you signed the note?
“A. That’s right. But I had no choice except to sign the note or have my house taken. So, we had to file suit and sign the note.
*979 “Q. But you knew at the time you signed the note?
“A. I signed the note only to keep from being foreclosed upon, is the only reason I signed it, and to buy some time.
“Q. And that was on April 1, 1983?
U * * * *
“Q. Is that a copy of your complaint?
“A. Yes, it is.
“Q. Mr. Cates filed that complaint for you?
“A. Yes.
"Q. Did you review that complaint before it was filed by Mr. Cates?
“A. Certainly did.
“Q. In this complaint that you filed or was filed on your behalf, yours and your wife’s behalf, Mr. Musselman, you make reference to the fact that money has not been — that the note is not — there is no amount owing on the note that’s referred to here, is that correct?
“A. As far as I am concerned there is no amount owing on it.
“Q. You say that if the collateral, which the bank had taken into its possession, was applied, the amount — that no amount would be due?
“A. Obviously.
“Q. Is that right?
“A. Yes.
“Q. Now, there was nothing that you learned in that regard between April 1, 1983, and the date this suit was filed, May 10th, 1983, was there?
“A. From the standpoint of what had actually transpired, the answer is no.
“Q. Okay.
“A. But we were firmly convinced that something had been taking place, but we did not know what.
“Q. Whatever you knew about all of that at the time this lawsuit was filed, you knew at the time you signed the note on April 1?
“A. I don’t understand your question.
“Q. Well, you didn’t get any new information between the time you signed the note on April 1, 1983, and the time this lawsuit was filed on May 10th, 1983, did you?
“A. We got enough information to believe that we needed to file a lawsuit.
“Q. In that period of time?
“A. I think so, yes. Yes, I do.
“Q. New information or was it information that you had at hand on April 1?
“A. April 1?
“Q. Yes, sir.
"A. Oh, no. When I signed the note April 1, we pretty well knew what we were going to do.
“Q. Okay, thank you. And when you say you pretty well knew what we were going to do, that meant sue the bank, just like you have testified to?
“A. That’s correct.
“Q. Right. The note that was executed by you and your wife on September 17th, 1982, was an individual note, wasn’t it?
“A. I am afraid it was.
“Q. Right. And that note was secured by the mortgage on her home?
“A. That is correct.
“Q. And there was a renewal of that obligation on April 1, 1983, and both of you again signed a note, is that correct?
“A. That’s correct.
“Q. And that note was again secured by your house?
“A. That’s right.”
Further evidence tending to show that Musselman had knowledge of potential claims against the bank on the date of renewal of the note is found in L.C. Clende-non’s deposition testimony.
Clendenon, a certified public accountant, was the accountant for OSA from its beginning until the end of 1981. Sometime in April or May of 1982, Clendenon was retained by Musselman to advise him and his wife and to negotiate for them with Mus-selman’s partner, D.L. Putman, concerning the dissolution of Musselman’s and Put-man’s business relationship.
Clendenon continued to advise Mussel-man and to represent Musselman through August 16, 1982, when Musselman and Putman signed their settlement agreements.
*980 During the spring and summer of 1982, Clendenon met with Musselman and the • Musselmans’ attorneys numerous times to discuss Musselman’s situation and his options. Throughout this time, Clendenon made notes of items that he either discussed or was going to discuss with Mus-selman. The notes dated July, 19, 1982, were entitled “reasons for settlement in lieu of court action.” It appears from Clendenon’s notes that during the summer of 1982, the very claims that the Mussel-mans now assert against the bank were discussed. Indeed, a lawsuit against the bank for damages from the “release of collateral,” “failure to credit the accounts receivable against the Musselmans’ notes,” and “insider dealing” was discussed by Clendenon, Musselman, and the Mussel-mans’ attorneys prior to the execution of the Musselmans’ note in September 1982. Clendenon testified as follows:
“Q. Right, sure. Were these discussed with Mr. Musselman? [referring to Clen-denon’s notes of July 19, 1982],
“A. Sure.
“Q. Okay, let’s go over these and let’s see what we have discussed with him.
“A. All right.
“Q. ‘Monetary Loss,’ that is talking about losing more money, is that right?
“A. Sure.
“Q. Okay, ‘B. Software of OSA/FIS would have to be turned over to the Trustee for his disposition for the satisfaction of creditors.’ And there you are talking about the Trustee in Bankruptcy of OSA or FIS or whoever?
“A. Yes, sir.
“Q. Okay, ‘C. Musselman would have no alternative but to sue [T]he Bank of Huntsville for damages from the release of collateral. Bank foreclosed but did not collect the receivables or sell the equipment. No credit against notes. Possibility of insider dealing with Bank and D.L.’ Is there any more elaboration on that or is that note sufficient in itself?
“A. I think it is pretty self-explanatory.
“Q. Okay, ‘D. If all the above occur the monetary loss of both parties — ’ and I take it that you are talking there about Mr. Musselman and Mr. Putman, both parties?
“A. Sure.”
It is undisputed that before the note was renewed on April 1, 1983, the Musselmans, as a matter of law, had knowledge of facts sufficient to put them on inquiry concerning the very subject matter of their lawsuit. Even with this knowledge, the Mus-selmans renewed their note with the bank. As a result of the renewal of the note, the Musselmans obtained written confirmation from the bank stating that they had been released from all of their obligations as guarantors of OSA’s debt to the bank, with the exception of the one that they had assumed in their individual capacities in September 1982. After obtaining the written acknowledgement of the release, the Musselmans filed the subject suit against the bank.
After having heard oral arguments, and upon study of the record and briefs, and cognizant of the burden on the movant to show the absence of a genuine issue of a material fact, I would hold that the trial court did not err in granting the bank’s motion for summary judgment. In my judgment, it is undisputed that the plaintiffs were cognizant of the very claims that they now assert against the bank, and that Musselman and his advisors actually contemplated the option of filing suit against the bank on the claims presented in this suit before the note was executed. Mussel-man’s deposition testimony and the notes of L.C. Clendenon, Musselman’s C.P.A., show that not only were the Musselmans aware of the facts on which their claims are based, but that the Musselmans were also counseled on the same claims now asserted; therefore, by executing the note in September 1982, and again in April 1983, the Musselmans waived whatever claims and defenses they otherwise might have been able to employ to escape their obligations under the note, as a matter of law.
I would affirm the trial court’s judgment; therefore, I dissent.
STEAGALL, J., concurs.